# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

Case No. 0:16-cr-00347-ADM-KMM

Plaintiff,

**REPORT AND
RECOMMENDATION**

v.

Scott Phillip Flynn,

Defendant.

David MacLaughlin and Benjamin Langner, Assistant United States Attorneys, counsel for the government

Earl P. Gray, Earl Gray Defense, and Paul C. Engh, counsel for Mr. Flynn

The government has charged Scott Phillip Flynn with conspiracy to defraud the United States, tax evasion, and filing false tax returns. Mr. Flynn has moved to dismiss the indictment, arguing that the substantive charges against him are barred by the statute of limitations. Mot. to Dismiss, ECF No. 22. Mr. Flynn also moves to suppress statements he made to law enforcement agents during a February 23, 2012 search of his home. Mot. to Suppress, ECF No. 31. For the reasons set forth below, the Court recommends that both motions be denied.

## I.    Motion to Dismiss

Mr. Flynn "moves for an Order dismissing the substantive offenses of this case because the statute of limitations has lapsed."[1] Mot. to Dismiss at 1. Ordinarily, the

---

[1]    Mr. Flynn does not appear to be arguing that the conspiracy charge asserted in Count 1 of the Indictment is barred by the statute of limitations, but seeks dismissal of the remaining charges for tax evasion and filing false tax returns.

charges against Mr. Flynn would be subject to a six year statute of limitations. 26 U.S.C. § 6531. However, the government argues that the six year deadline was extended by two years, nine months, and one day due to operation of a federal statute, 18 U.S.C. § 3292, which allows the government additional time to bring charges in cases requiring international investigation if certain conditions are met. Mr. Flynn's Motion to Dismiss challenges the legal sufficiency of two ex parte applications filed under that statute for suspension of the statute of limitations in this case.

### A.     18 U.S.C. § 3292

The statute of limitations for tax evasion and filing false tax returns is six years. 26 U.S.C. § 6531. However, 18 U.S.C. § 3292 provides that the statute of limitations may be suspended for a maximum of three years to allow time for international investigation if certain conditions are met. Section 3292 reads in pertinent part:

> **(a)(1)** Upon application of the United States, filed before return of an Indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country. . . .

> **(b)** Except as provided in subsection (c) of this section, a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.

> **(c)** The total of all periods of suspension under this section with respect to an offense—

> **(1)** shall not exceed three years; and

> **(2)** shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.

> **(d)** As used in this section, the term "official request" means a letter rogatory, a request under a treaty or convention, or any other request for

evidence made by a court of the United States or an authority of the
United States having criminal law enforcement responsibility, to a court
or other authority of a foreign country.

18 U.S.C. § 3292.

The Eighth Circuit Court of Appeals has not interpreted § 3292, but courts in
other federal appellate courts have. "A plain reading of § 3292 demonstrates that a
district court's decision to suspend the running of a statute of limitations is limited to
two considerations: 1) whether an official request was made; and 2) whether that
official request was made for evidence that reasonably appears to be in the country to
which the request was made." *United States v. Broughton*, 689 F.3d 1260, 1273 (11th Cir.
2012). A request for suspension of the statute of limitations must be accompanied by
"something with evidentiary value—that is, testimony, documents, proffers, and other
submissions bearing some indicia of reliability—tending to prove that it is reasonably
likely that evidence of the charged offense is in a foreign country." *United States v.
Trainor*, 376 F.3d1325, 1332 (11th Cir. 2004); *see also DeGeorge v. U.S. Dist. Ct. for Cent.
Dist. of Cal.*, 219 F.3d 930, 937 (9th Cir. 2000) ("[T]he government has some burden
to establish, as opposed to being able to merely assert without support, that the
foreign evidence it seeks meets the section's requirements.").

## B.    The § 3292 Applications

In this case, the government filed two separate applications to suspend the
running of the statute of limitations based upon investigation in two countries:
Australia and Costa Rica. Both applications were granted by judges in the District of
Minnesota.

### The 2013 Application

On October 11, 2013, counsel for the government, Assistant United States
Attorney David MacLaughlin, presented an Ex Parte Application for Suspension of
Running of Statute of Limitations to United States District Judge John R. Tunheim.
Gov't Ex. B. The 2013 Application was supported by a declaration of the
government's counsel that mirrored the averments in the ex parte application itself.

*See* Ex. B at 4-6 (10/11/2013 Decl. of David MacLaughlin). In the 2013 Application, the government asserted that a grand jury was impaneled in the District of Minnesota to conduct an investigation of Mr. Flynn and several other individuals for possible criminal offenses including: (1) tax evasion; (2) fraud and false statements; (3) conspiracy to defraud the United States; (4) wire fraud; (5) securities fraud; and (6) money laundering. Ex. B at 1-2. Pursuant to 18 U.S.C. § 3292, the government asserted that it had made an official request for evidence relating to the investigation to the Commonwealth of Australia because an Australian attorney named Steven Miotti had assisted Mr. Flynn and Michael Carnicle in evading income tax obligations. Ex. B at 2-3.

In particular, the 2013 Application alleged that Mr. Miotti had helped Mr. Fynn and Mr. Carnicle evade taxes "by recruiting numerous Australian nominees to hold stock for [Mr. Flynn and Mr. Carnicle] and to receive the proceeds of the sale of such stock and then circuitously to route those proceeds back to [Mr. Flynn and Mr. Carnicle]." Ex. B at 2. Although an official request for assistance had been sent to Australia pursuant to the Treaty between the Government of the United States of America and the Government of Australia on Mutual Assistance in Criminal Matters, the Department of Justice had not received a response at the time the 2013 Application was filed. Ex. B at 5, 7.

Based on the 2013 Application, Judge Tunheim found that Mr. MacLaughlin's declaration "summarized the relevant facts uncovered during the course of the investigation." Ex. B at 9. Further, Judge Tunheim concluded that: "[i]t reasonably appears, based on a preponderance of evidence presented to the Court, that evidence of the offenses under investigation is located in [the] Commonwealth of Australia; [and] [i]t further appears, based on a preponderance of the evidence presented to the Court, that the . . . Department of Justice made an official request [pursuant to § 3292]." Ex. B at 9. Based on these findings, Judge Tunheim granted the 2013 Application and ordered "that the running of the statute of limitations for the

offenses set forth in the [2013 Application] [was] [t]hereby SUSPENDED for the period authorized by 18 U.S.C. § 3292(c)." Ex. B at 9.

### The 2015 Application

The government filed another Ex Parte Application for Suspension of Running of Statute of Limitations on February 26, 2015. Gov't's Ex. C. In the 2015 Application, which was again supported by a declaration from Mr. MacLaughlin, the government explained that the grand jury was investigating Mr. Miotti, Mr. Flynn, Arnaldo Bonilla Quesada, and a number of entities associated with them, for the same list of offenses in the 2013 Application, including a "tax scheme." Ex. C at 1. The government explained that the grand jury's investigation "to date has revealed that Miotti, an Australian attorney, has assisted Scott Flynn in evading his United States income tax obligations by recruiting numerous Australian nominees to hold stock for Flynn and to receive the proceeds of the sale of such stock and then circuitously route those proceeds back to Flynn." Ex. C at 3. Further, the 2015 Application explains that "[s]ubstantially all of the proceeds were routed from Australia to Arnaldo Bonilla Quesada in Costa Rica, who then transferred the proceeds to Flynn." Ex. C at 3.

The government also stated that the grand jury was investigating Mr. Flynn and Mr. Quesada for potentially defrauding victims of the United States and Europe out of approximately $12 million by inducing them to purchase property in Costa Rica through material misrepresentations. Ex. C at 2.

> Specifically, Flynn and Quesada represented that, for prices that began at $90,000, the victims could obtain unencumbered title to lots in Costa Rica equipped with infrastructure (road, water and electricity connections) suitable for building dwellings. However, none of the victims received deeds or title to the lots, and it appears that the infrastructure was never built.

Ex. C at 2.

The 2015 Application stated that it reasonably appeared evidence of the alleged tax scheme and the fraudulent investment scheme would be found in Costa Rica.

Ex. C at 3. The Department of Justice made an official request to Costa Rica pursuant to the Inter-American Convention on Mutual Assistance in Criminal Matters, Ex. C at 3-4, but Costa Rica had not yet responded, *id.* at 7. Based on the 2015 Application, United States District Judge Patrick J. Schiltz found that: (1) Mr. MacLaughlin's declaration "summarizes the relevant facts uncovered during the course of the investigation"; (2) a preponderance of the evidence presented to the Court reasonably showed that evidence of the offenses under investigation was located in Costa Rica; and (3) a preponderance of the evidence presented showed that the Department of Justice made an official request to Costa Rica for the information. Ex. C at 12. Therefore, Judge Schiltz granted the application and suspended the statute of limitations for the offenses described in the 2015 Application. Ex. C at 12.

### C.    Extension of the Statute of Limitations

Because the 2013 Application and 2015 Application were granted, the government contends that the statute of limitations for the relevant charges in the Indictment was extended. If valid, the 2013 Application would suspend the running of the statute of limitations from October 10, 2013 (when the government made the official request to Australia) until July 14, 2016 (when Australia took its final action on the request. This overlaps with the entire period of suspension accomplished by the 2015 Application, which stopped the statute of limitations from running between January 15, 2015 and January 19, 2016. As a result, the full statute of limitations for the offenses covered by the Indictment would be eight years, nine months, and one day (or 6 years + 1005 days).

Against this backdrop, if § 3292 operated as the government alleges, then all but two counts of the Indictment are timely.[2] Because the Court finds that the

---

[2]    The government concedes that, even with the operation of 18 U.S.C. § 3292, two counts in the Indictment are untimely. Specifically, the government concedes that Count 8, which charges Mr. Flynn with filing a false tax return for 2006 on October 15, 2017, is time-barred. Gov't Resp. at 14, ECF No. 38. The government states that

*(footnote continued on next page)*

Applications and the resulting Orders satisfied the dictates of § 3292 and operated to effectively extend the statute of limitations, the Motion to Dismiss on this basis must be denied.

### 1. Elements of § 3292 Are Satisfied

With respect to counts 3-7 for tax evasion and counts 9-12 alleging filing false returns, the Court finds that the government satisfied the requirements of § 3292 in both the 2013 and the 2015 Application, and as a result, the crimes charged in the Indictment are not time-barred.[3] First, the 2013 and 2015 Applications included a showing that official requests were made to the governments of Australia and Costa Rica, respectively. Ex. B at 7 (request to Australia under a treaty); Ex. C at 8 (request to Costa Rica under a convention). Mr. Flynn does not contest that this requirement of the statute has been met, and the Court concludes that it has. *See* 18 U.S.C. § 3292(d) (defining an "official request" as including "a request under a treaty or convention"); *Broughton*, 689 F.3d at 1274 (finding that the government's requests complied with § 3292's "official request" requirement).

---

*(footnote continued from previous page)*
it will remove Count 8 when it files a superseding indictment. Gov't Resp. at 14. The government also agrees that Count 2 of the Indictment is time-barred as drafted, but claims that it will allege more recent overt acts relating to Mr. Flynn's 2006 tax year that will bring Count 2 within the statute of limitations. *Id.* at 15. If the government supersedes its indictment as represented, then the motion to dismiss should be denied as moot with respect to Counts 2 and 8. However, if the government does not do so, Counts 2 and 8 should be dismissed as time-barred.

[3] Mr. Flynn does not dispute the government's position about how long the statutes of limitations was suspended if § 3292 was properly invoked in this case, but instead challenges the validity of the Orders signed by Judge Tunheim and Judge Schiltz suspending the statute of limitations. Nor does Mr. Flynn argue that those Orders extended the statute of limitations in violation of § 3292(c)(1) or § 3292(c)(2).

Second, both of the official requests were for evidence that reasonably appeared to be located in foreign countries. The 2013 Application explained that Mr. Miotti, an Australian attorney, was involved in a scheme to help Mr. Flynn avoid paying taxes by recruiting a number of Australian nominees to hold stock for Mr. Flynn and then divert the proceeds through circuitous means back to Mr. Flynn. Ex. B at 2, 5. It was reasonable for Judge Tunheim to conclude that it appeared, by a preponderance of the evidence submitted in support of the 2013 Application, that evidence of this alleged scheme could be found in Australia. Similarly, the 2015 Application explained that Mr. Miotti and Mr. Flynn had been involved in an investment fraud scheme and a tax invasion scheme along with Mr. Quesada, who was located in Costa Rica. Ex. C at 2-3, 6-7. The government explained that proceeds of the tax evasion scheme involving Australian nominees (described above) were eventually routed through Mr. Quesada in Costa Rica before being sent to Mr. Flynn and that Mr. Flynn and Mr. Quesada also fraudulently induced investors to purchase property in Costa Rica based on material misrepresentations. Ex. C. at 6. It was therefore reasonable for Judge Schiltz to conclude that it appeared, by a preponderance of the evidence submitted in support of the 2015 Application, that evidence of these alleged crimes could be found in Costa Rica.

Third, the 2013 and 2015 Applications were both supported by legally sufficient evidence: the declarations of Mr. MacLaughlin. *See Trainor*, 376 F.3d at 1336 ("[T]he Government must present *some* evidence—something of evidentiary value— that it reasonably appears the requested evidence is in a foreign country."). Mr. MacLaughlin's declarations were signed, dated, and provided under penalty of perjury, thereby taking on the equivalent character of a sworn affidavit. *See* 28 U.S.C. § 1746 (allowing the submission of an unsworn declaration meeting the statute's criteria to have the same "force and effect" as a sworn affidavit and to fulfill a requirement that a matter be supported by evidence). Mr. MacLaughlin's declarations describe the nature of the criminal investigations that the grand jury was conducting and the information that was known about the alleged tax evasion and investment fraud schemes Mr. Flynn was believed to have played a part in. Thus, the

government's 2013 and 2015 Applications were supported by something of
evidentiary value as required by § 3292. *See United States v. Arrington*, No. 8:13-cr-146,
2013 WL 5963140, at *9 (D. Neb. Nov. 7, 2013) (report and recommendation
adopted by the district court finding that a postal inspector's declaration describing an
investigation of the defendant for a fraudulent investment scheme and money
laundering was sufficient to meet the requirements of § 3292). Mr. Flynn's arguments
that the statute's requirements were not met here are unconvincing.

### 2. *Trainor, Broughton, Lyttle,* **and** *Jenkins*

Primarily Mr. Flynn argues that the Applications were not accompanied by
sufficient evidence. He asserts that "[a] brevity contaminates both tolling
applications," and that "the Government's applications . . . offer up abysmal lack of
specifics. To uphold them would announce a future quantum of proof in diminution."
Def.'s Suppl. Mem. at 10. at 11. Although in support of his argument, Mr. Flynn relies
on *Broughton*, *Trainor*, *United States v. Lyttle*, 667 F.3d 220 (2d Cir. 2012), and *United
States v. Jenkins*, 633 F.3d 788 (9th Cir. 2010), close examination reveals that those
decisions do not tip the scales in his favor. Instead the relevant caselaw demonstrates
that both Applications satisfied the statute's requirements.

*Trainor*, the case on which Mr. Flynn relies most heavily, certainly stands for the
proposition that a § 3292 tolling application is insufficient when there is nothing of
evidentiary value whatsoever provided in support of the request that the statute of
limitations be suspended. 376 F.3d at 1327 (holding that a court could not properly
issue an order suspending the statute of limitations based on "an unsworn application,
accompanied by only a copy of an evidentiary request sent to a foreign government").
Under *Trainor*, the government must present "something of evidentiary value," which
is "accompanied by some indicia of reliability." *Id*. at 1331. But as explained above,
Mr. MacLaughlin's declarations plainly meet this threshold. Moreover, it is worth
noting that two United States District Judges found the 2013 and 2015 Applications
sufficient to meet the preponderance of the evidence standard established by § 3292,
which is entitled to some degree of deference and should not be lightly overturned.

*See Trainor*, 376 F.3d at 1335 ("Just as district courts do not regularly overturn magistrates' probable cause determinations, . . . we expect that an initial district court's preponderance of the evidence determination will not often be overturned by a later district court ruling on a post-indictment motion where the Government puts forward *some* reliable evidence.") (emphasis in original).

The opinions in *Broughton*, *Lyttle*, and *Jenkins* are similarly unhelpful to Mr. Flynn's cause. Each case describes government applications and supporting evidentiary material that were perhaps lengthier or more fulsome than the support provided in the Applications at issue here. *See Broughton*, 689 F.3d at 1274 (finding that the "sworn declaration by an Assistant United States Attorney, declaring the extent of the investigation into the fraudulent activities at issue and affirming the need for the discovery of certain information in Costa Rica" satisfied the statutory requirement that the request be made for information that reasonably appears to be located in a foreign country); *Lyttle*, 667 F.3d at 223 (describing the support for a legally sufficient § 3292 application as including an FBI agent's affidavit "documenting wire transfers between the United States and Hungary, as well as the grand jury testimony of a victim of the alleged fraudulent scheme"); *Jenkins*, 633 F.3d at 798 (concluding that a supplemental application filed by the government was sufficient because it included "the sworn declaration of [an] IRS Agent . . ., who described the IRS's investigation, the grand jury investigation and the evidence already recovered from Canada tending to indicate that further evidence of the offenses was abroad"). But none of these decisions supports Mr. Flynn's argument that brevity or conciseness alone invalidates a § 3292 application or his suggestion that they lack sufficient detail. And the Court found no authority in its own research to demonstrate that the statute imposes any quantitative minimum of evidence that an application must contain. Overall, none of the cases relied upon by Mr. Flynn support his argument that the Applications in his case were inadequately supported by the government.

### 3.    Multiple Applications

Mr. Flynn next argues that the government should not have submitted its 2015 Application without informing Judge Schiltz that it had already received a suspension order in 2013 to obtain evidence located in Australia. He asserts that the government's second application was improper because the government "split the requests for the purpose of unfair delay." Def.'s Suppl. Mem. at 11-12. The Court rejects this argument for several reasons.

First, the only case Mr. Flynn cites for this proposition is *State v. Zanter*, 535 N.W.2d 624 (Minn. 1995), which discussed issues raised by serial applications for search warrants unsupported by new information. The government's approach to filing the § 3292 applications in this case is completely distinct from the State's conduct in *Zanter*. In *Zanter*, the State repeatedly sought warrants to find the same evidence in the same location, despite that the previous unsuccessful searches clearly undermined the probable cause that could be shown in the later warrant applications. The State relied on no new information in seeking multiple bites at the same apple. Here, in clear contrast the government filed separate applications for suspension of the statute of limitations based on investigations in two different countries, rendering *Zanter* virtually irrelevant.

Second, Mr. Flynn's suggestion that the government submitted the 2015 Application for the purpose of delay is unsupported by any showing at all. Indeed, in the end, the suspension permitted by 2015 Application did not extend the limitations period at all beyond the three-year maximum allowed by § 3292(c)(1) because the delay the 2015 Application permitted was fully subsumed within the delay effectuated by the earlier Application. In fact, the statute of limitations was functionally unaffected by the 2015 suspension Order.

Finally, despite Mr. Flynn's arguments to the contrary, even if the government was aware in 2013 that evidence could be found in Costa Rica, § 3292 imposes no requirement that the government must make its application as soon as it learns such information. *See Arrington*, 2013 WL 5963140, at *11 ("[T]here is no requirement that

the prosecution act diligently in its pursuit of evidence necessary to prosecute an individual.") (citing *United States v. Bischel*, 61 F.3d 1429, 1434-35 (9th Cir. 1995) (declining "to read a diligence requirement into § 3292" because the statute has a "built-in limit" and rejecting defendant's argument that § 3292 violated his due process "right to a fixed statute of limitations"), and *United States v. Ratti*, 365 F.Supp.2d 649, 651 (D. Md. 2005) (there is "no obligation on the Government's part to act with any particular dispatch in seeking the information from a foreign government")). And to the extent Mr. Flynn argues simply that the government cannot make more than one request for a suspension order under § 3292, such a suggestion finds no support in the statutory text or in the case law.

For all these reasons, the Court recommends that Mr. Flynn's motion to dismiss be denied to the extent he seeks dismissal of Counts 3-7 and 9-12 in the Indictment.

## II.    Motion to Suppress Statements

In his motion to suppress statements, Mr. Flynn asserts that the government should be prevented from using certain comments he made during the search of his home on February 23, 2012 because he was not given *Miranda* warnings. His arguments in favor of suppression blur the analysis between the Fifth Amendment and the Sixth, implicitly claiming that both were violated by government agents. Mr. Flynn primarily asserts that he was functionally in custody during the execution of the search warrant, and therefore law enforcement should have given him *Miranda* warnings. Even if the Court finds that Mr. Flynn was not actually in custody, he invites the Court to "be innovative" and rule that interrogation at a suspect's home during the execution of a search warrant automatically triggers *Miranda*, regardless of circumstance indicating that the suspect is free to leave.[4] Mr. Flynn further claims that

---

[4]    Mr. Flynn argues that "it is unreasonable for the individual to abandon his home while the agents are swarming about with their uniforms and guns....[b]ecause that individual is emotionally compelled to stay." Def.'s Suppl. Mem. at 8.

he invoked his right to counsel, but law enforcement personnel executing the search warrant ignored his invocation and "pressed instead for Mr. Flynn's conversation and cooperation." Mot. to Suppress ¶¶ 2-5.

Under any theory, there is no constitutional basis on which to suppress the statements at issue and Mr. Flynn's arguments to the contrary are unpersuasive. The Court recommends that Mr. Flynn's motion to suppress be denied.

## A.    Relevant Facts

At the hearing on the motion, Special Agent Tim Nichols with the Internal Revenue Service testified concerning the events which form the basis for Mr. Flynn's motion. At about 7:30 a.m. on February 23, 2012, Agent Nichols and several other law enforcement officers executed a search warrant at Mr. Flynn's home. Tr. of June 26, 2017 Hr'g ("Tr.") 2:25-3:10 (time and date of execution); *id.* at 23:19-24:6 (indicating that Agent Nichols was with eight or nine other officers at the time of arrival though more arrived later); *id.* at 3:11-4:17 (indicating that a "dozen or so other agents" were ultimately involved). Mr. Flynn was not home at that time, but his wife answered the door, and Agent Nichols informed her they were there to search her home pursuant to a warrant. Tr. 4:18-5:4; *id.* at 5:25-6:1.

The officers did not have their firearms drawn at the front of the home and did not force entry; instead Mrs. Flynn opened the door and the officers entered the house. Tr. 5:5-16. At around 7:50 a.m., the agents allowed Mrs. Flynn to call Mr. Flynn and Mr. Flynn called back ten minutes later. Tr. 7:4-8:7.[5]

About forty minutes later, Mr. Flynn arrived at the house driving a 2009 Cadillac Escalade, and Agent Nichols met him at the front door. Tr. 8:10-18. Agent

---

[5]     The officers at first limited Mrs. Flynn's access to the phone because they were simultaneously executing a related search warrant at Mr. Flynn's father's home, and they did not want any communications to jeopardize that operation. Tr. 6:16-7:3; *id.* at 25:10-12.

Nichols informed Mr. Flynn of the warrant, but did not restrict Mr. Flynn's ability to leave, nor tell him that he could not leave. Tr. 8:19-24. Mr. Flynn was not restrained. Tr. 9:3-5. Instead, Agent Nichols told Mr. Flynn that he was not under arrest and that he could leave at any time. Tr. 14:12-18.

Agent Nichols then told Mr. Flynn that the officers wanted to ask him some questions and Mr. Flynn "said he did not think it would be wise to speak without an attorney." Tr. 9:11-10:1. Agent Nichols did not ask Mr. Flynn who his attorney was, give him a telephone, or tell him the phone would be available for him to call counsel. Tr. 25:24-26:9. Agent Nichols did not continue questioning Mr. Flynn at that time, but eventually Mr. Flynn asked Agent Nichols why law enforcement officers were there and what they were looking for. Tr. 10:10-23. Mrs. Flynn then handed Mr. Flynn a copy of the search warrant, and mentioned that agents had asked her about an individual referred to as "Mr. Neary." Tr.  10:24-11:5; 15:1-12. Mr. Flynn responded to this by asking the agents if they were at the Flynns' house because of "mortgage fraud involving Mr. Neary." Tr. 15:13-18. In response, Agent Nichols acknowledged that the agents were aware Mr. Neary had received some wire transfers, and Mr. Flynn responded by stating: "you can't hide the fact of a wire transfer." Tr. 15:19-16:1. Mr. Flynn also volunteered information to Agent Nichols about an Australian named "Miotti," purported loans from investors, certain concealment of wire transfers. Tr. 16:1-17:21. And after reviewing the search warrant, Mr. Flynn told Agent Nichols that he did not control the entities listed on the warrant, but instead volunteered that the companies were his father's. Tr. 11: 6-16.

Agent Nichols again told Mr. Flynn that the agents would like to sit down and talk to him and reminded him that earlier Mr. Flynn stated that he did not want to speak without an attorney. Tr. 12:14-25. Mr. Flynn responded that he did not want his words to be used to incriminate him, but Agent Nichols informed him that "they certainly could be used to incriminate [him]." Tr. 13:1-7. Mr. Flynn then made statements about Bruce Bullock, a tax professional who advised Mr. Flynn not to talk about certain trusts that were set up because they were "involved or complicated."

Tr. 13:8-21. Agent Nichols did not record any portion of the conversation he had with Mr. Flynn. Tr. 31:20-32:2.

Inside a garage outside the rear of the home, the officers also found a cellular phone inside a vehicle. Tr. 20:16-21:3.[6] The officers searched that cellular phone believing it was covered by the existing search warrant. Tr. 29:8-21. Mr. Flynn informed Agent Nichols that some of the text messages on the phone that were in Spanish and had been sent by a Costa Rican attorney. Tr. 29:22-30:13. Agent Nichols included mention of that in his memo about the execution of the search warrant so that others involved in the case would be aware that the phone might have privileged information on it. Tr. 30:14-24.

## B.    *Miranda* Warnings and Custodial Interrogation

Mr. Flynn primarily contends that admission of his statements at trial violates his Fifth Amendment rights because he was not given the warnings required by *Miranda v. Arizona*, 384 U.S 436 (1966), prior to his conversation with Agent Nichols. *See* Def.'s Suppl. Mem. at 5-9. Of course, such warnings are only required when a suspect is questioned under circumstances demonstrating that he is in custody. *United States. v. Martinez*, 462 U.S. 903, 908 (8th Cir. 2006). Mr. Flynn first suggests that he was functionally in custody in light of the totality of the circumstances, and therefore the warnings were required. Mr. Flynn alternatively suggests that even if he was not in custody, the Court should nonetheless require *Miranda* warnings under these circumstances because of the policy considerations surrounding interrogation of a suspect at his home. Neither approach succeeds.

No credible argument can be made that Mr. Flynn was in custody at the time he made the statements to Agent Nichols. *See United States v. Griffin*, 922 F.2d 1343,

---

[6]    Officers also searched the Cadillac Escalade in which Mr. Flynn had arrived at the scene pursuant to consent by Mr. Flynn. In his Motion to Suppress, Mr. Flynn makes no argument that the consent was invalid.

1349 (8th Cir. 1990) (listing non-exclusive factors governing whether a suspect is in custody, including whether he was informed he was free to leave, whether he possessed freedom of movement, whether he initiated contact or voluntarily acquiesced, whether strong arm tactics were employed, whether the atmosphere was police dominated, and whether the suspect was arrested at the end of questioning); *see also United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-47 (8th Cir. 2007) (same). Mr. Flynn was told he was not under arrest and that he and his wife were free to leave. He was not arrested at the end of the encounter, he was not physically restrained in any way and the officers did not restrict his ability to move around his property. Mr. Flynn drove to the house of his own volition after being contacted by his wife, and during the encounter, he voluntarily responded to the agents' questions and reinitiated conversation with the officers on more than one occasion. The totality of these circumstances plainly shows that a reasonable person in Mr. Flynn's position would not consider his freedom of movement restricted to a degree associated with formal arrest. *See United States v. Czichray*, 378 F.3d 822, 830 (8th Cir. 2004) ("Where a suspect is questioned in the familiar surroundings of his home, and informed several times of his right to terminate the interview at will, we believe that strong evidence of restraint on freedom of movement of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial."); *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) ("[A] reasonable resident who is unrestrained near the front door in the living room of his home, and who is advised that there is no arrest and that participation in any interview is voluntary, should know that he is free to leave or to terminate questioning."). Therefore, Agent Nichols was under no obligation to advise Mr. Flynn of his rights.

Mr. Flynn contends that he was "emotionally compelled to stay" by the presence of the officers in his home executing a search warrant and he asks the Court to create a presumption that a search of a suspect's home pursuant to a warrant is synonymous with custody for purposes of the Fifth Amendment analysis. Def.'s Suppl. Mem. at 8. He relies on *United States v. Longbehn*, 850 F.2d 450 (8th Cir. 1988), to support this argument Def.'s Suppl. Mem. at 8. Unfortunately for Mr. Flynn,

*Longbehn* does not support such a presumption. 850 F.2d at 452-53. Although the Eighth Circuit found that Mr. Longbehn was functionally in custody during an interrogation, it was not because he was at home at the time. Instead the Court found that Mr. Longbehn was detained at work after hours, not permitted to drive his own car but driven to his home by the police, chaperoned throughout the search, and interrogated by three separate officers. He was then taken by police back to the station and only after that was he told he was free to leave. It was not because Mr. Longbehn was at home, but because he was entirely under police control that custody was found. In fact, contrary to the presumption Mr. Flynn is attempting to create, the Eighth Circuit has repeatedly found that being questioned in one's own home, even during the execution of a search warrant, is a factor that lessens the coerciveness of questioning rather than deepens it. *See e.g., Williams*, 760 F.3d at 815 ("When a person is questioned on his own turf, . . . we have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.") (internal citation and quotation marks omitted); *see also Miranda*, 384 U.S at 449-50 (observing that police are trained that a suspect is more confident and comfortable when interviewed at home, and "more reluctant to tell of his indiscretions and criminal behavior" than when they are in custody).

Finally, Mr. Flynn argues that the Court should "be innovative" and "make a credibility determination adverse to the Government." Def.'s Suppl. Mem. at 7-8. The suggestion is *not* that Agent Nichols' testimony is incredible – Mr. Flynn concedes that he was "believable in the sense that he said the words and thought his combined sentences to be true" – but that the testimony should still be rejected because a conclusion of custodial status should be assumed under the circumstances. The Court declines to accept this invitation because nothing in the record suggests that the testimony concerning the objective factors relevant to custody should be discredited. And the Court will not couch a legal conclusion as a factual one simply to render it "nearly irreversible." Def.'s Suppl. Mem. at 7.

### C.    Other Fifth Amendment Arguments

Mr. Flynn suggests in passing that his initial statement that he did not think it was wise to speak without an attorney present was a sufficiently clear and unequivocal request for the assistance of counsel, rendering any statements made after that request violative of the Fifth Amendment. To the extent Mr. Flynn was making a separate Fifth Amendment argument from the *Miranda* arguments explored above, it is unavailing. Because Mr. Flynn was not in custody, his Fifth Amendment right to counsel was not implicated. *United States v. Fitterer*, 710 F.2d 1328, 1333 (8th Cir. 1983) ("Fitterer was not in custody at the time of the conversation with Sterry and therefore the [F]ifth [A]mendent right to counsel is not implicated."); *see also United States v. Muhlenbruch*, 634 F.3d 987, 998 (8th Cir. 2011) (declining to consider whether defendant's invocation of his right to counsel was sufficiently clear because the conclusion that he was not in custody meant that his Fifth Amendment right to counsel was not implicated). For this reason, the Court need not explore whether his statement was sufficiently unequivocal to make subsequent statements inadmissible.

Mr. Flynn also suggests in passing that, independent of the issue of custody, his statements were involuntary, and therefore inadmissible pursuant to the Due Process Clause of the Fifth Amendment. Def.'s Suppl. Mem. at 6. "A conviction based on an involuntary confession, obtained through police coercion, violates the Due Process Clause." *United States v. Carroll*, 207 F.3d 465, 472 (8th Cir. 2000). The voluntariness of a statement to law enforcement depends on the totality of the circumstances, including the conduct of law enforcement officials and the characteristics of the accused. *United States v. Morse*, 569 F.3d 882, 885 (8th Cir. 2009). "[C]oercive police activity is a necessary predicate to the finding that a confession is not ' voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (2009). Here, the record establishes that Agent Nichols and the other officers executing the search warrant did not engage in any coercive activity or tactics that could render Mr. Flynn's statements involuntary. No further consideration of this scarcely-raised argument is required.

For all these reasons, Mr. Flynn's Fifth Amendment rights were not violated and suppression of his statements is not required.

### D.    The Sixth Amendment

Mr. Flynn, in such brief mention that it is difficult to discern whether he is really raising an argument, suggests that his Sixth Amendment right to counsel was violated as well. Mr. Flynn asserts that "[t]he initial question is whether Mr. Flynn invoked his Sixth Amendment right," and states that it was unreasonable for the Agent to ignore his request. Def.'s Suppl. Mem. at 2. It is quite settled that law enforcement questioning of a suspect does not violate the Sixth Amendment right to counsel unless it occurs after criminal proceedings against the defendant have reached a critical stage. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984) ("[The Sixth Amendment right] does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'").) At the time Mr. Flynn made the statements at issue here, his case had not reached any critical stage: no charges had been brought, no arraignment had occurred. Indeed Mr. Flynn does not even attempt to argue that the right to counsel had attached, and points to no facts to support his Sixth Amendment claim. Accordingly, the Sixth Amendment right to counsel is not implicated and provides no basis on which to suppress the statements.

### E.    Minnesota Rule of Professional Conduct 4.2

Mr. Flynn also argues that "Agent Nichols was unfamiliar with Minnesota's Rule [of Professional Conduct ("MRPC")] 4.2[7] that prohibits law enforcement from

---

[7]    This Rule provides as follows:

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the

*(footnote continued on next page)*

interviewing, during a search, an individual who is represented by counsel" and suggests that this should lead to suppression of his statements. Def.'s Suppl. Mem. at 2. Mr. Flynn cites no Supreme Court or Eighth Circuit case law to support this proposition, but relies on *State v. Miller*, 600 N.W.2d 457 (Minn. 1999). Unfortunately for Mr. Flynn, the governing law on this issue makes clear that his argument lacks merit.

First, even if it were controlling authority, *Miller* did not purport to establish a test for any constitutional violation. *See id.* at 467 ("[B]ecause the interests protected by MRPC 4.2 and the constitutional protections relating to an individual's right to counsel are fundamentally different, there is no rational basis to conclude that the application of the protection afforded should necessarily be coextensive."). Instead, the Minnesota Supreme Court concluded that the prosecutors' knowledge that an organization that was under investigation was represented by counsel could be imputed to an investigating officer who ignored the organization's attorney's request to terminate an interview with his client and prohibited the attorney from being present during the interview. *Id.* at 464. By imputing the prosecutors' knowledge, under the specific circumstances of that case, the court determined that the "no-contact rule" in MRPC 4.2 had been violated and an employee's statements would be suppressed. *Id.* at 467-68.

Even if *Miller's* holding applied in federal court, it is readily distinguishable. In particular, here there is no evidence Mr. Flynn was actually represented in connection with the investigation. And even though he initially told Agent Nichols he did not think it was wise to speak without an attorney present, there is no evidence that the

---

(*footnote continued from previous page*)
    consent of the other lawyer or is authorized to do so by law or a court order."

MRPC 4.2.

agents or any prosecutor in the United States Attorney's Office were aware at the time of the search that Mr. Flynn had retained any attorney.

More importantly, *Miller* does not represent the controlling law in this Court. Indeed, the *Miller* court itself cited two Eighth Circuit decisions that directly undermine Mr. Flynn's position here: *United States v. Dobbs*, 711 F.2d 84 (8th Cir. 1983) and *United States v. Fitterer*, 710 F.2d 1328 (8th Cir. 1983). These cases make clear that the no-contact rule does not require suppression in federal proceedings whenever a government investigator communicates with a suspect who has previously retained counsel. *Fiterer*, 710 F.2d at 1333 (rejecting the defendant's contention that pre-indictment, non-custodial statements made by the suspect to a cooperating co-conspirator after the suspect had retained counsel should be suppressed pursuant to the Fifth or Sixth Amendment or the no-contact rule); *Dobbs*, 711 F.2d at 86 ("Assuming that this disciplinary rule is applicable in this case, it does not require government investigatory agencies to refrain from any contact with a criminal suspect because he or she previously retained counsel."). This Eighth Circuit has reiterated this conclusion in the years after deciding *Fitterer* and *Dobbs*. *See United States v. Plumley*, 207 F.3d 1086, 1095 (8th Cir. 2000) (citing *Fitterer* and *Dobbs* in rejecting argument that law enforcement agent's alleged violation of Iowa's "substantively identical" no-contact rule required suppression of statements).

In sum, MRPC 4.2 provides no basis for suppression under the circumstances of this case.

## III.    The Cell Phone

Mr. Flynn finally argues that no evidence obtained from the search of the cell phone found during the search of his home may be admitted against him pursuant to *Riley v. California*, 134 S. Ct. 2473 (2014). *Riley* held that law enforcement may not justify the search of the contents of a suspect's cell phone pursuant to the Fourth Amendment's exception to the warrant requirement for searches incident to arrest. *Id.* at 2485 ("We therefore decline to extend [cases applying the search incident to arrest exception] to searches of data on cell phones, and hold instead that officers must

generally secure a warrant before conducting such a search."). Here, the government has not attempted to justify the seizure of the cellular phone and the search of its contents pursuant to the search incident to arrest exception to the warrant requirement *Riley* is therefore inapposite.

The government asserts that the search of the cell phone's contents was authorized by the search warrant,[8] which listed "records" and "documents" among the items to be seized and defined those terms to include "any form of computer or electronic storage," Gov't's Ex. A at 3, an argument Mr. Flynn does not contest. Mr. Flynn therefore has not established any basis upon which the "records" and "documents" contained in the phone should be suppressed.

## Recommendation

Based on the foregoing, the Court makes the following recommendations.

1. Mr. Flynn's Motion to Dismiss, **ECF No. 22**, should be **DENIED**.

2. Mr. Flynn's Motion to Suppress Statements, **ECF No. 31**, should be **DENIED**.

Date: August 11, 2017                    *s/ Katherine Menendez*
                                          Katherine Menendez
                                          United States Magistrate Judge

---

[8]    Contrary to Mr. Flynn's suggestion that the cell phone was found in the Cadillac that Mr. Flynn drove to the house, Def.'s Suppl. Mem. at 4, the evidence shows that the phone was discovered in the Jaguar the officers found in the garage, Def's Ex. 1 at 4, which was covered by the search warrant the officers were executing at the home.

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.